**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

DIANNA ORLUSKE,

        Plaintiff,

vs.

MERCY MEDICAL CENTER–NORTH
IOWA,

        Defendant.

No. C 05-3018-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

---

**TABLE OF CONTENTS**

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   A. Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   B. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II. LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
   A. Summary Judgment Standards . . . . . . . . . . . . . . . . . . . . . . . . 16
   B. Orluske's Age Discrimination Claims . . . . . . . . . . . . . . . . . . . . 18
      1. Arguments of the parties . . . . . . . . . . . . . . . . . . . . . . . 18
         a. Mercy's argument . . . . . . . . . . . . . . . . . . . . . 18
         b. Orluske's response . . . . . . . . . . . . . . . . . . . . 19
         c. Mercy's reply . . . . . . . . . . . . . . . . . . . . . . . . 22
      2. Sufficiency of Orluske's prima facie case . . . . . . . . . . . . . 24
         a. Performing to the employer's expectations . . . . . . . 24
         b. Replacement by a younger employee . . . . . . . . . . 26
      3. Pretext and inferences of discrimination . . . . . . . . . . . . . 27
   C. Orluske's Retaliation Claim . . . . . . . . . . . . . . . . . . . . . . . . . 29
      1. Arguments of the parties . . . . . . . . . . . . . . . . . . . . . . . 30
         a. Mercy's argument . . . . . . . . . . . . . . . . . . . . . 30
         b. Orluske's reponse . . . . . . . . . . . . . . . . . . . . . 30
         c. Mercy's reply . . . . . . . . . . . . . . . . . . . . . . . . 31
      2. Sufficiency of Orluske's prima facie case . . . . . . . . . . . . . 31
         a. Protected activity . . . . . . . . . . . . . . . . . . . . . . 32
         b. Causal connection . . . . . . . . . . . . . . . . . . . . . 33

       **3.**       *Pretext and inferences of retaliation* . . . . . . . . . . . . . . . . . 36

**III. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

In this action, the plaintiff asserts claims of age discrimination and retaliation for filing a complaint alleging sexual harassment of third parties in violation of federal and state law arising from the termination of her employment as a "unit clerk" for a regional medical center. The defendant medical center has moved for summary judgment on all of the plaintiff's claims, asserting that the plaintiff was fired for legitimate, non-discriminatory reasons, including, primarily, repeated rude and discourteous behavior to other members of the medical center staff. Not surprisingly, the parties have very different views of what the record demonstrates and whether this action should ever be heard by a jury.

## I. INTRODUCTION

### A. Procedural Background

In a Complaint filed April 8, 2005 (docket no. 1), plaintiff Dianna Orluske originally asserted the following claims arising from her termination by defendant Mercy Medical Center–North Iowa (Mercy): age discrimination in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, and the Iowa Civil Rights Act (ICRA); disability discrimination in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and the ICRA; and retaliation for participating in a complaint of sex discrimination in violation of Title VII of the Civil Rights Act of 1964,

42 U.S.C. § 2000e, and the ICRA. Mercy filed an Answer and Affirmative Defenses (docket no. 9) to Orluske's Complaint on June 10, 2005, in which Mercy, *inter alia*, denied all of Orluske's claims. A little over a year later, on June 30, 2006, the parties stipulated to the dismissal, with prejudice, of Orluske's disability discrimination claims (docket no. 15). Therefore, the claims remaining before the court are Orluske's federal and state claims of age discrimination and retaliation for participating in a complaint of sexual harassment. Trial on Orluske's remaining claims is set to begin on November 13, 2006.

On June 30, 2006, however, Mercy filed a Motion For Summary Judgment (docket no. 16) seeking judgment in its favor on all of Orluske's remaining claims, which would obviate the need for trial. Orluske filed a response (docket no. 24) to Mercy's motion for summary judgment on August 8, 2006, and Mercy filed a reply (docket no. 30) in further support of its motion on August 21, 2006.

In her August 8, 2006, response, Orluske requested oral arguments on Mercy's motion for summary judgment. The court agreed that oral arguments on Mercy's motion for summary judgment were likely to be of benefit. Therefore, by order dated September 18, 2006 (docket no. 34), the court set oral arguments on Mercy's motion for Thursday, October 5, 2006. Owing to a shortage of available courtrooms, by order dated October 3, 2006 (docket no. 35), the oral arguments were rescheduled for Wednesday, October 4, 2006, but when proceedings in another matter ran overtime, the oral arguments in this case were once again rescheduled for October 5, 2006. At the oral arguments, plaintiff Dianna Orluske was represented by Blake Parker of the Blake Parker Law Office in Fort Dodge, Iowa. Defendant Mercy Medical Center–North Iowa was represented by Thomas W. Foley, who presented Mercy's argument, and Debra Lynne Hulett of Nyemaster, Goode,

West, Hansell & O'Brien, P.C., in Des Moines, Iowa. Mercy's summary judgment motion is now fully submitted and ripe for disposition.

## B. *Factual Background*

Ordinarily, in a ruling on a motion for summary judgment, the court would not attempt a detailed dissertation of the undisputed and disputed facts in the case. Rather, the court would provide sufficient facts, both undisputed and disputed, to put in context the parties' arguments for and against summary judgment. In this case, however, the question is what inferences can reasonably be drawn from a series of events that have no obvious hint of age discrimination or retaliatory intent. Thus, a rather more detailed description of the facts is required.

Dianna Orluske began working for Mercy, a regional medical center, in April 1981 as a "Unit Clerk," and retained that position for her entire tenure with Mercy. According to a job description provided by Mercy, a unit clerk performs receptionist and secretarial duties and serves as a communications liaison on a particular medical unit of the medical center. When the unit on which Orluske had previously worked as a unit clerk closed in 1999, Orluske applied for and was selected to fill the only unit clerk position then open, which was in a medical unit referred to by Mercy employees as "4E." Orluske's immediate supervisor on Unit 4E was Denise Dow, the Nurse Manager for the unit, and the Charge Nurse on the unit was Roxanne Hansen. Apparently, Orluske found the job on Unit 4E to be harder and to involve a "whole different atmosphere than what [she had] been used to for all the years that [she] had worked at Mercy." Defendant's Appendix at 5 (excerpt of deposition of Dianna Orluske).

In April of 1999, Dow rated Orluske's work performance below expectations in three of five categories, identifying the deficiencies in those categories as follows: Under

"Duties and Responsibilities," a deficiency in "quality improvement"; under "Interpersonal Relationships," a deficiency in "internal" relationships; and under "Working Conditions," a deficiency in "stress" and "unpleasant conditions." Defendant's Appendix, 47. Orluske, who believed that Hansen did not like her and was behind the negative evaluation, protested the evaluation. As part of the dispute resolution process, Orluske and Dow each chose three other staff members to evaluate Orluske. The scores from the other staff members resulted in a cumulative rating similar to the rating that Dow had originally given Orluske. Defendant's Appendix at 50. Nevertheless, Dow subsequently adjusted her evaluation to reflect higher scores in "quality improvement," "execution," and "overall quality" (only the first of which had been rated as deficient), *see id.*, and Orluske received a higher annual raise as a result. Orluske did not and does not contend that the negative marks in the April 1999 evaluation constituted age discrimination.

An interim evaluation of Orluske by Dow in late 1999 or early 2000[1] indicated improvement in each of the criteria in which Orluske had previously received a lower than "meets expectations" rating, but Orluske denies that her work actually improved. Rather, she contends that her performance remained the same, but that Dow now knew that she could not get away with giving Orluske a low evaluation. Similarly, an annual evaluation of Orluske by Dow in April 2000 was more positive. Orluske received positive annual evaluations again in April 2001 and April 2002, without any negative comments. The parties agree that, prior to April 2002, no one at Mercy said or did anything that led

---

[1]Mercy contends that the evaluation took place in November 1999, but Orluske contends that it either did not take place, or that the results were not discussed with her, until January 2000. The precise date of the evaluation does not appear to the court to be material to disposition of Mercy's motion for summary judgment.

Orluske to believe that Mercy felt less favorably toward her because of her age, no one ever made any negative comment to her regarding her age, and no actions were taken toward her that Orluske felt were motivated by her age.

Things apparently changed, however, when a new Charge Nurse for Unit 4E entered the picture in July 2002. The new Charge Nurse was Stephanie Banks, who was in her late twenties or early thirties, much younger than Orluske. Although Orluske once again contends that there was no change in her work performance, Banks raised issues regarding Orluske's work attitude and treatment of her fellow workers. Mercy contends that these problems were similar to ones previously identified by Dow, but Orluske contends that they were not similar at all. Orluske contends that the issues raised by Banks were because of Orluske's age and personality conflicts. More specifically, on July 12, 2002, Banks sent Dow a "Memo Regarding Employee Conduct," in which Banks identified four situations in which she believed that Orluske "chose to ignore [Mercy's] standards of behavior." Defendant's Appendix at 106. Orluske contends that her conduct in one of the situations noted by Banks involved a comment overheard from a conversation between friends and two others were appropriate responses on her part to the failure of floor nurses to use or the failure of Dow to require them to use call light phones. Orluske does not, however, offer any explanation for the fourth incident reported to Banks by another employee in which Orluske was reportedly rude and unhelpful to a patient's family member when the family member was looking for the patient's nurse.

In July 2002, Dow also received an anonymous report indicating that Orluske refused to change lab results that had been improperly entered into Mercy's computerized record-keeping system. Orluske contends that it was not her job as unit clerk to correct lab results incorrectly entered by a nurse, nor had the nurse responsible for the incorrect entry delegated to the unit clerk the task of correcting erroneous entries of lab results.

6

Therefore, she contends that she correctly directed the lab person who called about the error to contact the nurse responsible for the incorrect entry to get her to change the entry. Although Orluske concedes that a co-employee's complaint form was prepared concerning this incident, she points out that no disciplinary action with respect to her was ever taken as the result of this incident, because she actually handled the incident correctly. Orluske also apparently concedes that the complaint about her response to the incorrect entry of the lab results was not made because of her age.

On August 19, 2002, Dow issued Orluske an "Employee Disciplinary Action" marked as a "First Warning" arising from the following incidents:

> [Orluske] became angry & unpleasant when her request to the nursing staff to re-program their phones was denied. Her response did not exemplify the organization's Behavioral Standards. There have also been complaints recently that [Orluske] does not respect the personal property of the staff by [discarding] their lunches or eating their food. I have also had a recent complaint from a physician that she sits & complains about work & co-workers constantly. This undermines the efforts of the leadership team to improve the work environment. This behavior will not be tolerated.

Defendant's Appendix at 108-09. The specific requirements that Dow instructed Orluske to meet to avoid further corrective action were stated as follows: "No complaining at work at the desk or in public area. No retribution to staff that complained. Act in a manner that supports behavior standards." Defendant's Appendix at 108. The "First Warning" also advised Orluske that the "Outcome of Failure to Correct" would be "Further disciplinary action up to & including termination." *Id.* Orluske contends that she was not allowed by Dow to discuss the matters in the "First Warning" with the people involved and that she disagreed with the corrective action, so that she refused to sign it. The parties have not

identified any further disciplinary action toward Orluske as a result of either the underlying incident or Orluske's refusal to sign the corrective action notice.

Nevertheless, further conflicts arose. Specifically, on March 28, 2003, Dow placed Orluske on a "Performance Action Plan," citing continuing problems with Orluske's "Competency" in "Communication," "Problem Solving," and "Adaptability." Defendant's Appendix at 110. The March 28, 2003, Plan identified examples of improper behavior in each category, "desired behavior," and "action steps" to reach that desired behavior. *Id.* The March 28, 2003, Plan also stated that "outcomes of failure to meet desired behaviors" would be "Further disciplinary Action which could include termination." *Id.* at 111. Although Mercy contends that Orluske has identified no facts that suggest Dow placed her on the Performance Action Plan because of her age, Orluske believes that this disciplinary action was implemented as a part of and consistent with other actions by Mercy that targeted her because of her age. More specifically, she contends that, at about the same time that Dow issued the Performance Action Plan, Orluske was no longer allowed to use the work station specifically designed for her by the occupational therapy department to assist her with problems that she was having with carpal tunnel syndrome. Instead, the work station designed for her was removed, and Orluske was required to perform all of her work by pushing a mobile cart up and down the hallway. She contends that she was the only unit clerk in the medical center required to work from a work cart instead of from a designated work area. Consequently, she was required to perform all of her work and to have all of her conversations in a public hallway. She asserts that at no time were younger unit clerks required to push a work station up and down the hallway as she was, and that as soon as she was discharged, the younger unit clerk who took over from her was assigned to a desk, not a work cart. Thus, Orluske

asserts that all of the actions by Mercy at this time were taken because of her age and in an attempt to make her quit.

The March 28, 2003, Plan required Orluske to meet with Dow periodically to discuss her progress in the identified areas of deficiency. Mercy contends that Dow and Orluske had such follow-up sessions until September 2003, when Dow was replaced by Roxanne Pals as Orluske's immediate supervisor. Orluske, on the other hand, contends that the Performance Action Plan was completed by July 31, 2003, and that both Dow and Orluske "signed off" on the Plan at that time. The March 28, 2003, Plan submitted as part of Mercy's Appendix does indicate reports on follow-up review sessions, with signatures from both Dow and Orluske, on April 18, 2003, April 30, 2003, and June 6, 2003. Defendant's Appendix at 112. It also is marked as "complete" on July 31, 2003, with a further annotation, "appropriate problem solving-using computers in hallway," also dated July 31, 2003, and it is signed by both Dow and Orluske and dated July 31, 2003. At the oral arguments, Mercy contended that these notations indicated only completion of certain criteria, not completion of the entire Plan. Mercy also pointed out that there are further records of "follow-up reviews" pursuant to the Performance Action Plan on August 29, 2003, Defendant's Appendix at 113 (signed by Orluske and Dow), October 13, 2003, *id.* at 114-16 (signed by Orluske and Pals), December 16, 2003, *id.* at 116 (signed by Orluske and Pals), and January 30, 2004, *id.* at 117 (signed by Orluske and Pals).

Dow prepared her last annual performance review of Orluske in April 2003, during the period in which the March 28, 2003, Plan was undisputedly still in place. In that review, Dow indicated that Orluske "d[id] not meet" the required ratings of competency in communication, customer service, adaptability, and individual development, and in fact, Dow initially gave Orluske an overall rating of 1.8 on a 3-point scale. During a meeting with Orluske concerning that evaluation in May 2003, which Dow asked a nurse named

Julie Kolker from Unit 4E to attend, Dow raised Orluske's overall evaluation to 2.1, but the "d[id] not meet" ratings remained in place as to communication, customer service, and individual development. Although Mercy contends that Orluske has no reason to believe that Dow gave her a negative rating based on her age and that age was never mentioned in the meeting between Dow, Kolker, and Orluske, Orluske contends that her demeanor, as expressed by her more aged face, was discussed, and she also contends that the fact that she was required to work either on a mobile work station or at substations in the hallway was an indication that she was being placed in a difficult situation solely because of her age and in an attempt to get her to "move on."

One last incident involving Dow and Orluske occurred on or about April 24, 2003, when Orluske admits that she told a lab technician, "Don't mess with me, I know sh__." Although Dow discussed the incident with Orluske, she did not formally discipline Orluske for this incident. Orluske contends that the comment to the lab technician was intended as a joke, but she agrees that the statement was inappropriate.

Orluske does not dispute that, after Dow's departure in September 2003, she met with Roxanne Pals, Dow's replacement, periodically to review her performance. On September 25, 2003, a resident physician, Dr. Gable, working on Unit 4E reported to Pals that Orluske had been rude and disrespectful to him when making repeated requests that he move away from a computer he was using so that she could use it. Orluske contends that the resident was "surfing" the internet for personal enjoyment, while she needed the work station for business purposes. She also contends that she was not "rude," but simply caught the resident using the medical center's equipment for personal use. Nevertheless, she does admit that she asked the resident to relinquish the computer "probably four times," and that he "was probably upset" by her behavior. Orluske also did not dispute in her response to Mercy's statement of facts Pals's declaration that she placed Orluske on

probation for one year as a result of this incident or that, on October 13, 2003, she signed Pals's written probation notice advising her that if she "displays one incident of inappropriate behavior, [Pals] will recommend immediate termination." *Compare* Defendant's Statement Of Material Facts (docket no. 16-3), ¶ 30, *with* Plaintiff's Statement Of Contested Material Facts (docket no. 24-2), ¶ 30.[2] At oral arguments, however, Orluske did dispute whether Pals placed her on probation in October 2003, as well as whether the prior Performance Action Plan from March 28, 2003, was still in place.

On January 28, 2004, an anonymous employee identified as a "nurse" submitted a "PEERs" report detailing another incident of "inappropriate provider behavior" by Orluske. Defendant's Appendix at 124. The employee described the incident as follows:

> Peds staff sent a patient's mother to rm 428 to sleep. She is an employee here and her child has been in the Peds Unit for 6 days and has not slept much. The mother needed to sleep in a quiet environment as she was sleep deprived. As she was taking off her shoes, Dianna came in and asked her what she was doing. Questioning her on her intentions and why she thought she could rest there. "Don't they provide a cot for you?" She displayed a negative attitude and also told her that "I take my breaks here." She displayed an attitude that Dianna's need[s] were more important than a fellow employee's needs who is trying to deal with an extended hospitalization with a sick child. The mother who was sent to rest (by the nurse and the doctor) was very upset with her attitude.

Defendant's Appendix at 124. Orluske explains this incident by asserting that, at all times in the past when a patient's family member has used an extra room, there has been something placed on the door to identify the room as in use for that purpose, and that the

---

[2] The probation notice itself is not in the record at this time.

unit clerk has been advised of the use of the room for that purpose, but neither happened in this case. Although Orluske disputes that she was "rude" to the mother, she does admit that she asked the mother, "What are you doing here?" and also asked, "Well, don't they have cots down there?" meaning in the pediatrics unit. Orluske also contends that the room in question was often used as a sort of staff room, and that she had forwarded a personal call to that room, thinking it would be empty, because of past reprimands for having communications with persons in the hallway. Orluske also contends that, after making appropriate inquiries about why the person was in the room, she excused herself, and notes that the "PEERs" report about the incident did not come from that person, but from a third party.

In February 2004, Orluske submitted a "PEERs" report against Dr. Gable, the same resident who had complained about her behavior when she asked him to relinquish a computer work station, alleging that Dr. Gable was sexually harassing two female nursing assistants. Orluske also complained that Dr. Gable had yelled at her about some lab orders that were not completed. Orluske contends that the nursing assistants had complained to her and that she had their permission to file the "PEERs" report. However, Mercy contends that, when Pals contacted the nursing assistants about the report, they denied that Dr. Gable had harassed them in any way and that they both told Pals that they did not want her to take any actions in response to Orluske's allegations. They also denied complaining to Orluske about any incident, stating that, instead, Orluske had overheard a conversation between them, and they denied asking Orluske or giving Orluske permission to make a complaint about sexual harassment.

In Orluske's appendix, Orluske has included another "PEERs" report that is not mentioned in either party's statement of facts. The report, by an anonymous "nurse," is dated March 12, 2004, but refers to an "event" on March 5, 2004, as follows:

12

In the past few weeks, I've had some concerns with our unit clerk, Diana Orlusky [sic]. The nurses look over the kardexs in the back room prior to report in am. Then we go to the substations to get report. I had a pt's kardex initially but then could'nt [sic] find it later and searched several places including returning to the table in back room on 4E. I finally asked Diana [sic] if she had seen this kardex and she had when she cleared the back table off and put it with other papers and placed it on the back shelf, knowing that we needed that kardex but never said anything or returned it to the proper place. Another day I had a pt. that was going to be off the floor for 3 hours for tests and needed to have meds. I took the meds and accuscan down to ultrasound only to discover that the accuscans do not work in radiology. She needed the meds so gave them there, saving the packages with the bar code to be scanned later when the pt. returned to the floor later in the day. I kept th torn packages in the plastic container with a note saying, "Do not throw these away", and set them on the med cart. Later Diana [sic] came along and took the container. I retrieved the container and said I need those, and her reply was "Well, make sure you throw them away when you're done with it.["] Another day I saw her opening one of the drawers to our med cart where we keep some supplies. She was taking out the plastic bags that pharmacy sends our meds in. We recycle them. I asked her to leave them in there since we use them for returning pt's meds to pharmacy after they are discharged. Her reply was "And just how many pt.s are you going to discharge today?". She does not ask anyone if someone needs this or if it is anyone's but either places things somewhere else or throws some things away.

*See* Plaintiff's Appendix at 13. The preventive action requested was stated, "I don't think she should be throwing anything away from our desks or our med cart." *Id.* Orluske contends in her brief that Mercy solicited this report to bolster the grounds for firing

Orluske in retaliation for filing the report of sexual harassment by Dr. Gable. Mercy has not, however, relied on this report as a ground for Orluske's termination.

On March 8, 2004, Orluske was the subject of another anonymous "PEERs" report from a "clinical leader," which contained the following description of an incident:

> PT had change in physical assessment. Stat orders received and initiated. Comp. met panel was one of these stat orders. Glucose on labdraw was <20; information called to Dianna, UC. This info was not relayed to RN or Charge. Lab printout found after UC already punched out and left. Found at approx 1500. PT's treatment was delayed due to this. PT had head CT, and EEG ordered instead of this relevant glucose being addressed. In mean time at CT, PT possibly aspirated oral emesis. PT increased in complexity and transferred to unit and intubated.

Defendant's Appendix at 125. Orluske contends that this "PEERs" report was filed by Stephanie Banks and that it was an attempt by Banks to blame Orluske for Banks's own failure to deal with the patient, who was "crashing," because Banks decided to provide services to another patient so that she could leave at the end of her shift, instead of providing follow-through care for the "crashing" patient. Orluske also contends that it is not a unit clerk's job to interpret lab reports and that she handled the report properly by placing it where she was supposed to, so that caregivers would have access to it. Although Mercy contends that Orluske admits leaving the unit for the day without advising anyone of the lab results, Orluske contends that she went further than necessary, because she called the unit after she left, from her car in the parking lot, to make sure that the next nurse in charge was aware of the lab report that had come in. She contends that treatment of the patient was not delayed by her handling of the lab report.

Finally, on March 12, 2004, a mail clerk told Pals that Orluske had been rude to her regarding the delivery of mail on Unit 4E and that the clerk no longer wanted to

deliver mail to that floor. Mercy contends that the manager of the mail clerks met with Pals to discuss this incident and to voice his concerns that Orluske was rude to and intimidated his staff and that her attitude only improved temporarily when he confronted her about her conduct. Orluske denies that she was ever rude to a mail clerk and contends that the mail clerk manager never discussed her attitude with her. She admits that she did instruct a mail clerk about how to deliver mail in her unit, but she contends that she did not do so in a rude fashion.

On March 16, 2004, on Pals's recommendation, Mercy terminated Orluske's employment. Orluske does not dispute Pals's declaration that she fired Orluske because of the incidents that occurred from September 2003 through March 2004 and because, based upon Pals's review of information in Orluske's personnel file, Pals had concluded that Orluske's conduct was part of a pattern of behavior that had recurred during her employment on Unit 4E. Although Pals declares that Orluske's age had nothing to do with the decision to terminate her, Orluske contends that she was fired shortly after complaining about sexual harassment by Dr. Gable. Mercy responds that Pals has averred that she did not know anything about Orluske's complaint about Dr. Gable's sexual harassment of the nursing assistants at the time that she recommended that Orluske be terminated.

Orluske was in her mid-fifties at the time of her discharge. Mercy contends that Orluske's permanent replacement, Sharon Krominga, was actually older than Orluske and that she was selected over a younger candidate because of her long experience as a unit clerk. Orluske, however, points out that her immediate replacement, Nicole Wigant, was not only younger, but was given a permanent work station, instead of being required to use a mobile work station as Orluske was.

## II. LEGAL ANALYSIS

### A. Summary Judgment Standards

Rule 56 of the Federal Rules of Civil Procedure provides that a prosecuting or defending party may move, at any time, for summary judgment in that party's favor "as to all or any part" of the claims at issue. FED. R. CIV. P. 56(a) (summary judgment for claimant) & (b) (summary judgment for defending party). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). As this court has explained on a number of occasions, applying the standards of Rule 56, the judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Quick*, 90 F.3d at 1377 (same). The court is prohibited from making credibility judgments or engaging in fact-finding from conflicting evidence on a motion for summary judgment. *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1075 (8th Cir. 2006); *Yates v. Rexton, Inc.*, 267 F.3d 793, 800 (8th Cir. 2001).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Rose-Maston v. NME*

*Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir. 1993). When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997), *cert. denied*, 523 U.S. 1040 (1998); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir. 1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir. 1995). An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel*, 953 F.2d at 394 (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," *i.e.*, are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Beyerbach*, 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394.

If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997). Ultimately, the necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994). However, as this court has also often explained, the rule in this circuit is that, because summary judgment often turns on inferences from the record, summary judgment should seldom or rarely be granted in employment discrimination (and retaliation) cases. *See, e.g., Crawford v. Runyon*, 37

17

F.3d 1338, 1341 (8th Cir. 1994) (citing *Johnson v. Minnesota Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir. 1991)).

The court will apply these standards to Mercy's motion for summary judgment on Orluske's claims, taking each claim in turn.

### B. *Orluske's Age Discrimination Claims*

#### 1. *Arguments of the parties*

In support of its motion for summary judgment, Mercy contends that Orluske cannot establish a *prima facie* case of age discrimination under either federal or state law based on circumstantial evidence. Orluske, on the other hand, asserts that she can, indeed, generate genuine issues of material fact on her claims of age discrimination in violation of the ADEA and the ICRA.

##### a. *Mercy's argument*

More specifically, Mercy contends that Orluske was not meeting Mercy's legitimate expectations for job performance, in light of all of the disciplinary action taken against her for inappropriate behavior, which began as early as 1999, and came to a head in early 2004. Mercy points out that Orluske admits the conduct at issue, and so Mercy contends that Orluske's disagreement with the discipline that she received as a result of that conduct does not raise a fact issue concerning whether she was meeting Mercy's expectations. Furthermore, Mercy contends that Orluske was not replaced by a younger person. Rather, Mercy contends that Sharon Krominga, who became Orluske's permanent replacement, was actually older than Orluske. Mercy argues that Ms. Krominga's selection was not made to eviscerate Orluske's age claim, as Orluske contends, but was based on Ms. Krominga's years of experience with Mercy in a comparable position, and that Pals, who

made the final selection of Ms. Krominga, did not know about Orluske's complaint of age discrimination at the time that she chose Ms. Krominga to replace Orluske.

Mercy also argues that the record makes clear that it had a legitimate, non-discriminatory reason for firing Orluske, based on her workplace misconduct. Moreover, Mercy argues that Orluske cannot point to any evidence raising a jury question that its proffered reason was either pretextual or motivated by an age discriminatory animus. There is no hint of pretext, Mercy argues, because of Orluske's obvious performance deficiencies, and neither the court on summary judgment nor a jury at trial is entitled to second-guess the wisdom or fairness of an employer's employment decisions, as long as those decisions are not discriminatory. Mercy argues that Orluske has marshaled nothing more than speculation that the real reason for her termination was her age.

### b.    *Orluske's response*

In response, Orluske contends that the only elements of her *prima facie* case of age discrimination that are contested are whether she was qualified for her position, *i.e.*, whether she was performing up to Mercy's expectations, and whether she was replaced by a younger individual. Contrary, to Mercy's contentions, she argues that these disputed elements should be decided by a jury.

First, Orluske contends that her evaluations demonstrate that she was meeting Mercy's expectations, because she was only 4/100ths of a point away from a "meets expectations" rating in July 1999; 15/100ths of a point away from "exceeds expectations" and was clearly meeting all performance expectations in January 2000; and continued to receive "exceeds expectations" or "effective" ratings in each of her reviews in May 2000, May 2001, April 2002, and May 2003. Moreover, she contends that after she was put on the March 28, 2003, Performance Action Plan, she completed all of the required steps by July 31, 2003, so that she not only cured perceived performance deficiencies, but did so

in a very short time. She also contests Mercy's assertion that she has admitted all of the conduct that formed the basis for criticism of her, because she admits making mistakes, but argues that the disciplinary actions were in retaliation for acting as an advocate either for herself or on behalf of the nursing assistants who were sexually harassed by Dr. Gable. She also asserts that the incident in which she entered a room being used by a pediatrics patient's mother, which Mercy cites as one of the grounds for her discharge, occurred two months before her discharge, and the incident involving throwing away things that belonged to other employees, which she argues is also one of the grounds that Mercy cites for discharging her, occurred on March 5, 2004, but was not reported until March 12, just days before she was fired, and her conduct in that incident was actually consistent with her duties to keep the work area neat and clean. Moreover, she contends that neither of these incidents is consistent with any of her prior alleged misconduct.

Orluske argues that, because the court's function at summary judgment is not to weigh the evidence, but to determine whether there are genuine issues of material fact for trial, the court must find that there were genuine issues of material fact as to the adequacy of her performance. She also contends that she was improperly fired before she was given a chance to improve her performance in light of the latest complaints upon which her discharge was purportedly based. She distinguishes cases on which Mercy relies by asserting that her performance actually met or exceeded the employer's expectations and that she showed improvement in her performance, rather than deterioration, when complaints about her performance were brought to her attention.

Second, Orluske argues that she was replaced by a younger individual. Although Mercy asserts that Sharon Krominga was Orluske's ultimate replacement, and was actually older than Orluske, Orluske asserts that Mercy has admitted that she was replaced immediately after her discharge by Nicole Wygand (or Wigant), who was much younger

than she was, and whom Orluske had actually trained.  Orluske contends that an older individual was only placed in her position after Orluske filed her age discrimination complaint, apparently suggesting that Mercy was attempting to cover its tracks.  Thus, she asserts that she has generated genuine issues of material fact on this element of her *prima facie* case, as well.

Next, Orluske rejects Mercy's contention that she cannot show that the legitimate, non-discriminatory reasons for her discharge—the January 28, 2004, incident involving entering a room being used by a pediatric patient's mother; the March 8, 2004, incident involving the "PEERs" report by Stephanie Banks concerning mishandling of a lab report for a patient who was "crashing"; and the anonymous nurse's "PEERs" report that within the "past few weeks" immediately preceding her discharge, Orluske had been throwing away things—were pretextual.  She contends that her discharge was, instead, in retaliation for the "PEERs" report that she had made concerning Dr. Gable's *sexual harassment* of others and yelling at her.  She points out that the nurse's anonymous "PEERs" report details purported misconduct by Orluske over "the past few weeks," which is not coincidentally the same period during which Orluske's complaints about Dr. Gable were being investigated.  Orluske argues that there are at least genuine issues of material fact that Mercy was attempting to generate negative information to bolster a decision to discharge her.  She also contends that there was no similarity between these last incidents and any prior incidents, which all involved lack of communication.

Orluske also disputes Mercy's contention that, even if Orluske can generate genuine issues of material fact that Mercy's reasons for discharging her were pretexts, she cannot generate genuine issues of material fact that the real reason for her discharge was age discrimination.  Orluske contends that she can generate such genuine issues of material fact, because Mercy relied on a "stale" incident from January 28, 2004, to fire her in

March 2004, but did not consider the incident in January sufficiently serious to warrant discussing it with her in a timely fashion while she was supposedly on an improvement plan. Similarly, she argues that, after she filed her "PEERs" complaint about Dr. Gable, Mercy solicited nurses to point out things that Orluske had purportedly done "in the past few weeks." Even though her age discrimination claim is circumstantial, Orluske contends that it is sufficient to be heard by a jury.

### c.   Mercy's reply

In reply to Orluske's attempts to generate genuine issues of material fact on her federal and state age discrimination claims, Mercy reiterates its contention that Orluske simply was not meeting Mercy's legitimate expectations, so that she was not qualified for her position. Mercy reiterates that it is relying on the undisputed facts that, on October 13, 2003, Orluske was placed on probation for one year because she repeatedly, rudely, and disrespectfully asked a resident physician to let her use a computer that the resident was using; that in January 2004, Orluske had a rude encounter with a pediatric patient's mother who was resting in a room that Orluske wanted to use for personal reasons; that on March 8, 2004, Orluske received lab results marked "STAT" for a patient who was "crashing," but failed to take proper steps to let anyone know about the report before leaving at the end of her shift; and that on March 12, 2004, Orluske was rude to a mail clerk. Thus, Mercy does not rely on the anonymous nurse's report complaining that, on March 5, 2004, Orluske threw away things that the nurses needed. Mercy contends that Orluske admits each of the incidents on which it does rely, but then attempts to shift blame for those incidents elsewhere, without addressing the fact that the incidents were inconsistent with Mercy's expectations about staff behavior.

Mercy also asserts that Orluske has failed to generate a genuine issue of material fact that she was replaced by a younger employee. Mercy points out that even Orluske

recognizes that Ms. Wigant, who was younger, was only a temporary fill-in for Orluske after Orluske was terminated. Mercy also points out that Orluske does not dispute that Sharon Krominga, who was ultimately chosen to replace Orluske permanently, was actually older than Orluske and had considerably more experience with the position than Ms. Wigant, who also applied for the permanent position, because Ms. Krominga had previously been the evening unit clerk on Unit 4E and had been a unit clerk with Mercy for many years. Mercy asserts that it followed standard procedures to fill the vacancy left when Orluske was fired and that Ms. Pals, the decisionmaker in the hiring of Orluske's replacement, did not know that Orluske had filed an administrative charge of age discrimination at the time that she hired Ms. Krominga as Orluske's replacement. The temporary replacement of Orluske with a younger person, when someone was needed to fill the position temporarily until a permanent replacement could be selected, Mercy contends, does not satisfy the requirements of Orluske's *prima facie* case of age discrimination. Moreover, Mercy contends that Ms. Wigant was not the only temporary fill-in after Orluske was fired, but that Ms. Krominga and other unit clerks covered the position, as well.

Mercy next contends that Orluske's disagreement with its characterization of the incidents and the performance deficiencies that led to Orluske's discharge does not generate genuine issues of material fact that the reasons given by Mercy were pretexts for age discrimination. Rather, Mercy contends that, based on the record, a reasonable person would have to speculate to find that Orluske's age, rather than her persistent performance problems, was the reason for Orluske's discharge. While Orluske may have evidence of personal conflict with her supervisors, Mercy contends that Orluske does not have any evidence demonstrating that the conflict arose from an age-discriminatory animus.

### 2. *Sufficiency of Orluske's* **prima facie** *case*

Age discrimination in employment is prohibited by both federal and Iowa law. *See* Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*; Iowa Civil Rights Act (ICRA), Iowa Code § 216.6(1)(a). To establish a *prima facie* case of age discrimination under either federal or state law, in a case based on circumstantial evidence like the one now before the court, the plaintiff must show that she was in an age-protected class (over 40 for purposes of the ADEA); (2) that she was qualified for her job, *i.e.*, that she was performing to her employer's expectations; (3) that she was discharged; and (4) that age was a factor in the employer's decision to terminate her. *See, e.g., Chambers v. Metro. Prop. & Cas. Ins. Co.*, 351 F.3d 848, 855 (8th Cir. 2003); *and compare Sievers v. Iowa Mut. Ins. Co.*, 581 N.W.2d 633, 638 (Iowa 1998); *Vaughn v. Must, Inc.*, 542 N.W.2d 533, 538 (Iowa 1996). The court agrees with Orluske that only two elements of Orluske's *prima facie* case are at issue here: whether she was qualified for her job, *i.e.*, whether she was performing to her employer's expectations, and whether she was fired under circumstances giving rise to an inference of age discrimination, *i.e.*, whether she was replaced by a younger person. The court finds that Orluske has failed to generate genuine issues of material fact on either of these elements.

### a. *Performing to the employer's expectations*

In deciding whether or not an employee was performing to the employer's expectations, the question is whether the employee's deficiencies in some respect were beyond the level that constitutes adequate performance of one's job. *See, e.g., Schierhoff v. GlaxoSmithkline*, 444 F.3d 961, 966 (8th Cir. 2006) (considering, in an age discrimination case under Missouri law, the extent of the employee's absences and concluding that they were "well beyond the level of non-attendance that we said in *Pickens [v. Soo Line R.R. Co.*, 264 F.3d 773 (8th Cir. 2001),] amounted to an inability to perform

one's job"). Where an employee has previously received favorable evaluations, then receives negative evaluations before her termination, changes in the circumstances of her employment, including a new supervisor or job changes, or failure to meet new targets, may generate genuine issues of material fact on the adequacy of the employee's performance. *See Haas v. Kelly Servs., Inc.*, 409 F.3d 1030, 1035 n.1 (8th Cir. 2005). On the other hand, an employee fails to generate a genuine issue of material fact on this element, where it is undisputed that the employer identified deficiencies in the employee's performance, communicated those deficiencies to the employee on a regular basis, and the employee did not improve. *See Erenberg v. Methodist Hosp.*, 357 F.3d 787, 793 (8th Cir. 2004).

This case falls into the latter category, the one typified by the decision in *Erenberg*. Although Orluske contends that her poor performance reviews began when Ms. Banks became the Charge Nurse, clearly there had been deficiencies noted by Mercy before Ms. Banks took over. More importantly, Ms. Banks took over almost two years before Orluske was fired, and Orluske had been subject to discipline repeatedly for failing to meet Mercy's behavior standards from July 2002 until her discharge in March 2004. Orluske's attempts to distinguish the types of misconduct from each other, attempting to break the pattern into discrete events, fails to generate any genuine issue of material fact that she was meeting her employer's expectations, when the unifying thread in all of the misconduct charged against her is misbehavior toward other staff members. Several such incidents in the last months of Orluske's employment, despite warnings about her behavior toward staff members, demonstrate that Orluske was not, as a matter of law, meeting her employer's expectations for behavior of staff members. *Erenberg*, 357 F.3d at 793 (where the employer identified deficiencies to the employee and communicated them to the employee, and the employee did not improve, there was no genuine issue of material fact as to

meeting the employer's expectations). Rather, the numerous incidents of misconduct over eighteen months prior to Orluske's termination, all of which were communicated to Orluske, demonstrate that, as a matter of law, Orluske had deficiencies that were beyond the level that constituted adequate performance of her job, and hence, Orluske was not meeting her employer's expectations. *See, e.g., Schierhoff*, 444 F.3d at 966.

Thus, Orluske's *prima facie* case fails on this element, as a matter of law.

### b.    *Replacement by a younger employee*

In determining whether an employee has established the element of her a *prima facie* case of age discrimination requiring her to show that her age was a factor in her discharge, *see Chambers*, 351 F.3d at 855; *Sievers,* 581 N.W.2d at 638; *Vaughn*, 542 N.W.2d at 538, the courts look to whether the employee's replacement was "substantially younger" than the plaintiff. *See Wittenburg v. American Express Fin. Advisors, Inc.*, ___ F.3d ___, ___, 2006 WL 2771679, *7 (8th Cir. Sept. 28, 2006) (citing *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313 (1996)). The Sixth Circuit Court of Appeals has held that, where a younger worker is the "obvious temporary replacement," the focus of the analysis must be on the age difference between the plaintiff and her *permanent* replacement, not between the plaintiff and her *temporary* replacement. *See Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 n.2 (6th Cir. 2003). Here, as in the Sixth Circuit case, Ms. Wigant, who was admittedly "substantially younger" than Orluske, was the "obvious temporary replacement, as [s]he had been doing exactly the same job as [Orluske]." *Id.* Thus, the court's focus must be on the age difference between Orluske and her *permanent* replacement. *Id.* Here, Orluske's permanent replacement, Ms. Krominga, was actually older than Orluske, and was well-qualified for her position. Under the undisputed facts, Orluske has failed as a matter of law to establish that she was replaced by a "substantially younger" employee.

Moreover, any inference of age discrimination that might arise from replacement of Orluske, even temporarily, with a much younger employee, simply disappears in light of the undisputed fact that other employees besides Ms. Wigant, including Ms. Krominga, who was actually older, *also* covered Orluske's position temporarily. Finally, there is no inference that the choice of Ms. Krominga to replace Orluske was an attempt to eviscerate Orluske's age discrimination claim, where it is undisputed that the decisionmaker for Orluske's replacement, Ms. Pals, was not aware of Orluske's age discrimination claim when she made the decision about who was to replace Orluske.

Thus, Orluske's age discrimination claims under federal and state law fail on this "age was a factor" element of Orluske's *prima facie* case, as well.

### 3. Pretext and inferences of discrimination

Even assuming that Orluske could establish, or generate genuine issues of material fact on, all of the elements of her *prima facie* case of age discrimination, *see Wittenburg*, ___ F.3d at ___, 2006 WL 2771678 at *4 (the court may assume, without deciding, that the plaintiff has established a *prima facie* case, and pass on to the other steps in the analysis); *Jones v. United Parcel Serv., Inc.*, ___ F.3d ___, ___, 2006 WL 2404041 (8th Cir. Aug. 22, 2006) (page numbers unavailable) (where the employer offers a legitimate reason for its conduct, the court may pass on to the ultimate question of intentional discrimination), the court concludes that Orluske's federal and state age discrimination claims fail on the remaining steps of the analysis of her claim. If the employee establishes a *prima facie* case of age discrimination, the employer must then produce a legitimate, non-discriminatory reason for its adverse employment action, and if the employer does so, the employee must demonstrate not only that the proffered reasons are pretexts, but that they are pretexts for age discrimination. *See, e.g., id.*; *Sievers*, 581 N.W.2d at 638; *Trobaugh v. Hy-Vee Food Stores, Inc.*, 392 N.W.2d 154, 156 (Iowa 1986). More

substantial evidence than the plaintiff's *prima facie* case is required to prove pretext, because the evidence of pretext is viewed in light of the employer's legitimate, non-discriminatory explanation. *Jones*, ___ F.3d at ___, 2006 WL 2404041 (citing *Sprenger v. Federal Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001)).

Here, Mercy has proffered Orluske's series of performance problems as the legitimate, non-discriminatory reason for her termination. The court finds that any one of those problems could reasonably be the basis for Orluske's termination. In response, Orluske has simply failed to offer anything more than her speculation that age had anything to do with the adverse employment decisions by Mercy. Such speculation certainly is not the more substantial evidence of age discrimination required at this stage of the analysis. *See Jones*, ___ F.3d ___, ___, 2006 WL 2404041. For example, Orluske has not offered any evidence that younger employees who engaged in the same sorts of misconduct charged against her were treated differently, which might give rise to the necessary inferences. *See id.* Orluske's attempts to explain away each of the incidents on which her discharge was purportedly based as not actually involving misconduct simply is not evidence of the necessary caliber, where it is undisputed that she engaged in the conduct, and it is undisputed that Mercy considered the conduct to fail to meet the necessary performance standards.

Nor has Orluske generated the required inferences of age discrimination from her assertion that complaints about her "demeanor" are "code" for age discrimination. The record shows, and Orluske conceded at oral arguments, that *she* introduced her age into the discussion of her "demeanor" problems by referring to herself as "the old sergeant" faced with a new, young lieutenant, and by explaining complaints that she had appeared angry in certain incidents by referring to her aged face or by asserting that that was just how she looked. At the oral arguments on Mercy's motion for summary judgment,

Orluske's counsel conceded that these comments referring to her age were at best "stray remarks," and moreover, "stray remarks" *by the plaintiff*, which cannot generate any inference of age discriminatory animus *on the part of the defendant. See, e.g., Browning v. President Riverboat Casino-Missouri, Inc.*, 139 F.3d 631, 635 (8th Cir. 1998) ("'[D]irect evidence' does not include 'stray remarks in the workplace,' 'statements by nondecisionmakers,' or 'statements by decisionmakers unrelated to the decisional process itself.'") (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)); *see also Hitt v. Harsco Corp.*, 356 F.3d 920, 925 (8th Cir. 2004) ("While we have noted that 'stray remarks' regarding age may be relevant to establishing a *prima facie* case or pretext under some circumstances, such comments are not persuasive evidence of motive when the remarks are made by persons other than a decisionmaker." (citing *Girten v. McRentals, Inc.*, 337 F.3d 979, 983 (8th Cir. 2003)).

Thus, as a matter of law, Orluske's age discrimination claims under federal and state law fail, because Orluske has failed to generate genuine issues of material fact on the ultimate question of age discriminatory intent.

### *C. Orluske's Retaliation Claim*

Orluske also contends that Mercy retaliated against her for filing a charge of sexual harassment of nursing assistants by Dr. Gable in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), and the ICRA, IOWA CODE § 216.1. Mercy also seeks summary judgment on these claims.

### 1. Arguments of the parties

#### a. Mercy's argument

Mercy also argues that it is entitled to summary judgment on Orluske's retaliation claims under federal and state law, because Orluske has not generated genuine issues of material fact on all of the elements of her *prima facie* case. First, Mercy argues that Orluske did not engage in any protected activity, because Orluske admits that the incident of alleged sexual harassment of nursing assistants by a resident physician that she reported was not based on any first-hand knowledge on her part. Therefore, Mercy contends that Orluske could not have reasonably believed that the conduct that she was reporting violated Title VII. Next, Mercy argues that Orluske simply cannot point to any material facts demonstrating a nexus between her report of supposed sexual harassment and her discharge. Mercy contends that Orluske can only point to supposed temporal proximity between her report and her discharge, but more is required on the present record. Mercy points out that there is no evidence that the resident physician about whom Orluske complained had any voice in the decision to discharge her, and Orluske cannot identify any facts, merely suppositions, feelings, and speculations, that her report actually had anything to do with her firing. Finally, Mercy contends that there is evidence that Mercy responded to Orluske's complaint of sexual harassment of the nursing assistants by the resident physician by investigating the incident, which undermines any inference of retaliation.

Thus, Mercy contends that Orluske's federal and state retaliation claims also fail as a matter of law.

#### b. Orluske's reponse

Orluske contends that, although she has no direct evidence of retaliation, she does have sufficient circumstantial evidence to defeat summary judgment on this claim, as well. First, she contends that her "internal" report of sexual harassment of third parties by

Dr. Gable should warrant the same protection as an "external" report. She also contends that she was discharged within weeks of filing her complaint against Dr. Gable, which generates genuine issues of material fact on both the "adverse employment action" and "causal connection" elements of her retaliation claim. More specifically, she points out that the time frame between her report and her termination was mere weeks, not months, and that during that relatively brief time frame, Mercy obtained "PEERs" reports against her concerning conduct "in the past few weeks" to bolster its decision to discharge her.

    *c. Mercy's reply*

   In reply, Mercy contends that Orluske cannot establish any causal connection between her complaint of sexual harassment of third parties by Dr. Gable and her termination sufficient to sustain her federal and state claims of retaliation. At best, Mercy contends that Orluske has shown only a weak temporal relationship between the complaint and her discharge. In the absence of anything more, Mercy contends that Orluske's temporal link is too tenuous to support her retaliation claims.

    *2. Sufficiency of Orluske's* **prima facie** *case*

   To establish a *prima facie* case of retaliation under either Title VII or the ICRA, the plaintiff must present evidence that she (1) engaged in activity protected under Title VII; (2) an adverse employment action was taken against her; and (3) there was a causal connection between the two. *Thompson v. Bi-State Dev. Agency*, ___ F.3d ___, ___, 2006 WL 2707639, *4 (8th Cir. Sept. 22, 2006) (citing *Kaspar v. Federated Mut. Ins. Co.*, 425 F.3d 496, 502 (8th Cir. 2005)); *Twymon v. Wells Fargo & Co.*, ___ F.3d ___, ___, 2006 WL 2595961, *9 (8th Cir. Sept. 12, 2006); *Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 750 (Iowa 2006) (stating this *prima facie* case for retaliation claims under both Title VII and the ICRA). Mercy contends that Orluske cannot generate genuine issues of material fact on the first and third elements of her *prima facie* case of retaliation.

### a.    *Protected activity*

The Eighth Circuit Court of Appeals has held that "'a plaintiff bringing a retaliation claim under Title VII must establish that she personally engaged in the protected conduct.'" *Clark v. Johanns*, 460 F.3d 1064, 1067 (8th Cir. 2006) (quoting *Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 819 (8th Cir. 1998) (emphasis added)). The plaintiff need only report the allegedly wrongful activity to engage in protected activity; she need not "oppose" it, as well. *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 915 (8th Cir. 2006). Where no one could have reasonably believed that the incident reported by the plaintiff violated Title VII (or the underlying statute), the plaintiff's retaliation claim fails. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001). On the other hand, the Eighth Circuit Court of Appeals has also made clear that "'plaintiffs who reasonably believe that conduct violates Title VII should be protected from retaliation even if a court ultimately concludes that [a] plaintiff was mistaken in her belief.'" *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 n.3 (8th Cir. 2005) (quoting *Peterson v. Scott County*, 406 F.3d 515, 525 n.3 (8th Cir. 2005)); *Boyle*, 710 N.W.2d at 750 (even though the plaintiff's hostile environment claim failed at trial, she still presented enough evidence to warrant a decision on her retaliation claim based on retaliation for filing the hostile environment claim). Thus, the court may assume, without deciding, that reporting certain conduct was statutorily protected activity. *Id.*

Mercy seems to contend that Orluske could not have reasonably believed that she was reporting conduct in violation of Title VII when she reported that Dr. Gable had allegedly sexually harassed two nursing assistants, because she did not have first-hand knowledge of the allegedly harassing incidents. The court is not convinced that first-hand knowledge is the test of "reasonable belief" that the plaintiff is reporting a violation of anti-discrimination laws. *Compare Breeden*, 532 U.S. at 270 (the test is whether anyone

could reasonably believe that the conduct reported violated Title VII). Indeed, Orluske could have reasonably believed that the incident she reported (and which she apparently overheard the nursing assistants describe), in which Dr. Gable stroked their hair and flirted with them, constituted sexual harassment, particularly in light of the hospital hierarchy which ordinarily places a gulf in relative power and status between nursing assistants and physicians. Moreover, Orluske did not have to be right about whether the conduct she reported actually constituted sexual harassment to have engaged in protected activity by reporting the incident, so the fact that Mercy's investigation revealed that the nursing assistants did not believe that they had been sexually harassed and did not want to pursue any claims of sexual harassment does not mean that Orluske did not engage in protected activity by reporting the incident. *Peterson*, 406 F.3d at 525; *Boyle*, 710 N.W.2d at 750. However, the court need not determine whether Orluske engaged in protected activity, because the court finds that whether she did or did not engage in protected activity does not decide the case. Therefore, the court will assume, without deciding, that Orluske engaged in protected activity when she reported the alleged sexual harassment of the nursing assistants by Dr. Gable. *See Logan*, 416 F.3d at 881 n.3.

### b. *Causal connection*

Mercy also contends that Orluske cannot generate genuine issues of material fact on the "causal connection" element of her *prima facie* case of retaliation, because she relies only on a very weak "temporal connection" between her protected activity and Mercy's adverse employment action. Where the only connect between the protected activity and the adverse action is time, and that connection is only a weak one, that may not be enough to establish the third element of the plaintiff's *prima facie* case of retaliation. *See Thompson*, ___ F.3d at ___, 2006 WL 2707639 at *4; *cf Teachout v. Forest City*

*Community Sch. Dist.*, 584 N.W.2d 296, 299 (Iowa 1998) (the causation standard for a retaliation claim is high). As the Eighth Circuit Court of Appeals has explained,

> Although we have opined that the "timing of [a] termination can be close enough to establish causation in a prima facie case," *Haas v. Kelly Servs., Inc.*, 409 F.3d 1030, 1037 (8th Cir. 2005), we have repeatedly stated that "[g]enerally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation," *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999); *see also Haas*, 409 F.3d at 1037. Furthermore, "[o]ur recent cases have, in our view, made clear that a 'mere coincidence of timing' can rarely be sufficient to establish a submissible case of retaliatory discharge." *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002).

*Thompson*, ___ F.3d at ___, 2006 WL 2707639 at *4; *accord Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 915 (8th Cir. 2006) (noting that Eighth Circuit cases "create a complicated picture" concerning the role of timing in retaliation claims); *Teachout*, 584 N.W.2d at 302 (temporal proximity alone is insufficient to establish the necessary causal connection). In *Thompson*, the Eighth Circuit Court of Appeals found that the case before the court was not one of those where "mere coincidence of timing" was sufficient to establish a case of retaliation. *Id.* In that case, the employee's return to work after six months of sick leave provided the employer with the first opportunity to take disciplinary action for conduct that occurred before the employee went on sick leave. *Id.* Thus, the coincidence in timing of protected activity and adverse action dissipates, if the adverse action is taken at the first opportunity to discipline the employee for other misconduct.

Here, while the adverse action that Orluske contends was retaliatory followed her report of alleged sexual harassment by just a few weeks, that temporal proximity may not

be enough to establish the necessary causal connection. *Thompson*, ___ F.3d at ___, 2006 WL 2707639 at *4. In this case, Orluske's termination in mid-March 2004 was not the first opportunity to discipline her for misconduct in January 2004, but the discipline did follow promptly on the heels of other misconduct unrelated to her complaint about sexual harassment of third parties. As in *Thompson*, the court is unwilling to assume that the adverse action was *because of* the report of sexual harassment, rather than *because of* other misconduct, or to believe that any reasonable inference of a causal connection between her protected activity and the adverse action can be drawn where there was so much *other* misconduct upon which the adverse action was properly based, as a matter of law, and there is no other evidence of a causal connection between Orluske's protected activity and Mercy's adverse action.

The causal link can also be forged by evidence "'that an employer's "retaliatory motive played a part in the adverse employment action."'" *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 866 (FMLA retaliation case) (quoting *Kipp*, 280 F.3d at 897, in turn quoting *Sumner v. United States Postal Serv.*, 899 F.2d 203, 208-09 (2d Cir. 1990)). Such evidence may include evidence of discriminatory or retaliatory comments, or evidence that there was a pattern of adverse action or escalating adverse actions after the protected activity. *Id.* There is simply no such evidence in the record here. Again, where the escalating discipline toward Orluske was properly based on *other* misconduct, as a matter of law, there is no reasonable inference that the escalating adverse actions were *because of* Orluske's protected activity.

On the other hand, the causal link is broken if the decisionmaker for the allegedly retaliatory decision was unaware of the protected activity that is the basis for the retaliation claim. *Robinson v. Potter*, 453 F.3d 990, 994 (8th Cir. 2006) (retaliation claim under the Rehabilitation Act). Mercy points out that Pals has averred that she did not know anything

35

about Orluske's complaint about Dr. Gable's sexual harassment of the nursing assistants at the time that she recommended that Orluske be terminated. While Orluske contends that the investigation of her complaint against Dr. Gable was going on in the weeks before she was terminated, she does not identify who was conducting that investigation or point to any evidence that Pals knew about the complaint or the investigation. Thus, Pals's undisputed lack of knowledge about Orluske's complaint of sexual harassment breaks the causal link between Orluske's protected activity in making the complaint and Mercy's adverse action in firing Orluske.

Thus, Orluske's federal and state retaliation claims fail as a matter of law, because Orluske has failed to generate genuine issues of material fact on the "causal connection" element of her *prima facie* case.

### 3. Pretext and inferences of retaliation

As with discrimination claims, if the plaintiff establishes a *prima facie* case of retaliation, the employer must come forward with a legitimate, non-retaliatory reason for its conduct, and if the employer does so, the employee must establish that the proffered reasons are a pretext, and that the real reason is retaliation. *Twymon*, ___ F.3d at ___, 2006 WL 2595961 at *9. The court may also assume, without deciding, that the plaintiff has established a *prima facie* case of retaliation, and simply pass on to the final steps of the analysis. *Id.* Although the court concluded above that, as a matter of law, Orluske could not establish a *prima facie* case of retaliation, the court will, in the alternative, assume that she has done so, and consider the later stages of the analysis of Orluske's retaliation claims.

Where the plaintiff fails to demonstrate that the asserted rationale for adverse action was a pretext for retaliation, a district court's grant of summary judgment for the employer on a retaliation claim is appropriate. *Id.* Moreover, as the Eighth Circuit Court of

36

Appeals has repeatedly recognized, "[e]ngaging in protected activity 'does "not insulate an employee from discipline for ⋯ disrupting the workplace." '" *Arraleh v. County of Ramsey*, ___ F.3d ___, ___, 2006 WL 2561240, *7 (8th Cir. Sept. 7, 2006) (quoting *Wallace v. Sparks Health Sys.*, 415 F.3d 853, 858 (8th Cir. 2005), in turn quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131 (8th Cir. 1999), with alteration in original). In *Arraleh*, the Eighth Circuit Court of Appeals also noted that mere weeks between protected activity and allegedly retaliatory conduct "may suffice to establish causation in [the plaintiff's] prima facie case," but that "temporal proximity alone is generally insufficient to prove pretext." *Arraleh*, ___ F.3d at ___, 2006 WL 2561240. Thus, where the record showed that the employer presented evidence regarding the employee's performance deficiencies, all of which were recorded before the employee ever complained of discrimination, there was no inference of pretext, and the district court properly granted summary judgment for the employer on the employee's retaliation claim. *Id.*

Here, if Orluske's evidence of temporal proximity between her protected activity and her discharge is somehow enough to generate genuine issues of material fact on the "causal connection" element of her *prima facie* case of retaliation, it is certainly not enough to generate genuine issues of material fact on "pretext." *See id.* Although Orluske's discharge was purportedly based on misconduct that occurred both before and after her protected activity of reporting alleged sexual harassment, *cf. id.*, the court cannot find any inferences of pretext, where the court has found that, as a matter of law, Orluske's termination was properly based on any one or more of those incidents of misconduct, at least where there is no evidence, only speculation, that would suggest that the real reason for the discharge was retaliation, rather than the misconduct. Again, "[e]ngaging in protected activity 'does "not insulate an employee from discipline for ⋯ disrupting the workplace." '" *Arraleh*, ___ F.3d at ___, 2006 WL 2561240 at *7 (quoting

*Wallace*, 415 F.3d at 858, in turn quoting *Kiel*, 169 F.3d at 1131, with alteration in original). The record is replete with evidence that Orluske was fired for misconduct, and there is simply no evidence that would give rise to a genuine issue of material fact that the real reason for the discharge was to retaliate against Orluske for reporting alleged sexual harassment of third parties by a resident physician.

Mercy is entitled to summary judgment on Orluske's retaliation claims under federal and state law.

## III. CONCLUSION

Even keeping in mind that summary judgment should seldom or rarely be granted in employment discrimination (and retaliation) cases, *see, e.g., Crawford*, 37 F.3d at 1341; *Johnson*, 931 F.2d at 1244, the court concludes that this is one of those rare employment cases in which summary judgment is appropriate. Stating the legal principles of summary judgment in employment discrimination cases is a simple task. Applying those principles to the paper record that forms the judicial crucible that decides which plaintiffs may proceed to trial and which get dismissed is far more daunting. Missing in the standard incantation of summary judgment principles is the role of experience. Justice Oliver Wendell Holmes wrote, "The life of the law has not been logic; it has been experience." OLIVER WENDELL HOLMES, THE COMMON LAW 1 (1881). Thus, experience teaches that thoughtful deliberation of summary judgment in employment discrimination cases is grounded in the consideration of each case through a lens filtered by the following observations. Employment discrimination and retaliation, except in the rarest cases, is difficult to prove. It is perhaps more difficult to prove today—more than forty years after the passage of Title VII—than during Title VII's earlier evolution, and nearly forty years after the passage of the ADEA, both of which are at issue here. Today's employers, even

those with only a scintilla of sophistication, will neither admit discriminatory or retaliatory intent nor leave a well-developed trail demonstrating it. *See, e.g., Riordan v. Kempiners*, 831 F.2d 690, 697-98 (7th Cir. 1987). Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment discrimination cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge. This is especially true because the very best workers are seldom employment discrimination plaintiffs—since the economic costs to the employer for discrimination are proportional to the caliber of the employee, discrimination against the best employees is the least cost effective. *See, e.g., id.* Rather, discrimination plaintiffs tend to be those average or below-average workers—equally protected by Title VII, the ADA, the ADEA, or the FMLA—for whom plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination. *See, e.g., id.* Nevertheless, in this case, the undisputed evidence is all on one side, and both the arguments of the parties and the court's experience show that the plaintiff ultimately relies on nothing but speculation, not evidence, to attempt to generate genuine issues of material fact on required elements of her claims. While the undersigned is as eager as any federal judge to enforce anti-discrimination and anti-retaliation laws, *where the evidence warrants*, the court also believes that membership in a protected class or engaging in protected activity does *not* insulate a "protected" employee from discipline for misconduct or deficient performance. *Cf. Arraleh*, ___ F.3d at ___, 2006 WL 2561240 at *7 ("Engaging in protected activity does not insulate an employee from discipline for ⋯ disrupting the workplace.") (internal quotation marks and citations omitted).

THEREFORE, Mercy's June 30, 2006, Motion For Summary Judgment (docket no. 16) is **granted** as to all of Orluske's remaining claims of age discrimination in violation

of the ADEA and the ICRA and retaliation for filing a claim of sexual harassment in violation of Title VII and the ICRA.

**Judgment shall enter accordingly**.

**IT IS SO ORDERED.**

**DATED** this 10th day of October, 2006.

_Mark W. Bennett_
_____
MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA